JOSEPH DUFFY, Plaintiff, v. POULOS BROTHERS CONSTRUCTION COMPANY, Defendant and Counterdefendant-Appellee (The Village of Oak Lawn, Defendant and Counterplaintiff-Appellant).

First District (4th Division)   No. 1—90—3478

Opinion filed December 19, 1991.—Rehearing denied March 9, 1992.

Richard T. Wimmer and Philippe R. Weiss, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant.

Greg A. Kinczewski, of Tews, Theisen & Theisen, of Chicago, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

The Village of Oak Lawn (the Village) appeals from the dismissal of its counterclaim against Poulos Brothers Construction Co. (Poulos) alleging that Poulos breached the parties' construction contract by failing (a) to procure insurance naming the Village as an additional insured and (b) to indemnify and defend the Village against claims by Joseph Duffy, the plaintiff in an action against the Village and Poulos.

On September 28, 1988, the parties entered into a contract for the construction of a public safety facility, i.e., a police and fire station, in Oak Lawn, Illinois. On March 6, 1989, Duffy, a laborer on the project, allegedly sustained serious injuries when he fell off a ladder on the construction site. Duffy filed a four-count complaint against Poulos and the Village. Counts I and II were directed against Poulos and alleged violations of the Structural Work Act (Ill. Rev. Stat. 1989, ch. 48, par. 60 et seq.) and negligence. Counts III and IV alleged violations of the Structural Work Act and negligence by the Village.

The Village filed its answer and an affirmative defense to Duffy's negligence claim based on the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1989, ch. 85, pars. 2–105, 2–207). The Village also filed a counterclaim against Poulos. Count I of the counterclaim alleged breach of contract by Poulos for Poulos' failure to procure insurance coverage for the Village. In count I, the Village sought a judgment against Poulos in the amount of any damages for which the Village was found liable to Duffy and also for

costs and expenses, including the costs of defending Duffy's suit. Count II of the Village's counterclaim sought contribution from Poulos. Duffy's negligence claim against the Village was subsequently dismissed. The other counts of Duffy's complaint remain pending in the trial court.

Poulos filed a motion to dismiss count I of the Village's counterclaim for breach of contract. Poulos asserted that the indemnification provision in the contract was void as being contrary to Illinois public policy, as codified in section 1 of "An Act in relation to indemnity in certain contracts" (Ill. Rev. Stat. 1989, ch. 29, par. 61) (the Act or the Indemnity Act), and that the agreement to procure insurance was also unenforceable because it did not explicitly require that Poulos provide insurance coverage for the Village's own negligence. Following briefing and arguments by the parties, the trial court granted Poulos' motion to dismiss count I of the counterclaim. This appeal followed.

We first consider the Village's contention that Poulos breached its promise to procure liability insurance which named the Village as an additional insured. Paragraph 11.5.1 of the contract, entitled "Certificate of Insurance—Owner as Additional Insured," provides:

"The Owner, its officers, agents and employees shall be named as additional insureds on all insurance policies required to be purchased by the Contractor or a Subcontractor. A certificate of insurance, indicating the Owner, its officers, agents and employees as co-insureds shall be filed with the Owner, by the Contractor, for each insurance policy required to be purchased by the Contractor or a Subcontractor."

The insurance coverage Poulos was contractually required to obtain included comprehensive liability insurance and general liability insurance for bodily injury and property.

Poulos argues that the above-quoted insurance provision does not explicitly require it to provide insurance covering the Village's own negligence and, thus, is void and unenforceable as being contrary to public policy. Poulos relies on *Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628, and *Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.* (1946), 395 Ill. 429, 70 N.E.2d 604, as support of its position.

Our analysis begins with a brief review of the law relating to indemnification and insurance in the construction industry. Prior to 1971, the supreme court held that agreements which indemnified another against that party's own negligence were not necessarily void as against public policy. (*John Griffiths & Son Co. v. National Fireproofing Co.* (1923), 310 Ill. 331, 141 N.E.2d 739.) The general allow-

ance of indemnification agreements was qualified, however, by the supreme court in *Westinghouse*, which held that an indemnity contract will not be construed as indemnifying a party against its own negligence unless such a construction is required by clear and explicit language, or such intention is expressed in unequivocal terms in the indemnity agreement. The purpose of this rule of strict construction limiting the enforcement of contractual indemnity provisions was to insure that one agreeing to the extraordinary liability of indemnifying another against his own negligence was fully aware of the extent of his liability. *Cox v. Lumbermens Mutual Casualty Co.* (1982), 108 Ill. App. 3d 643, 439 N.E.2d 126.

In 1971, the legislature passed "An Act in relation to indemnity in certain contracts" (Ill. Rev. Stat. 1971, ch. 29, par. 61 *et seq.*) (the Act). Section 1 of the Act provides:

> "With respect to *** construction [contracts] *** every covenant, promise or agreement to indemnify or hold harmless another person from that person's own negligence is void as against public policy and wholly unenforceable." (Ill. Rev. Stat. 1971, ch. 29, par. 61.)

The Act was intended to further public policy favoring regulation in the construction industry and also to arrest efforts to contractually avoid liability for negligence and to promote safe working conditions on construction sites. (*Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 336 N.E.2d 881.) It was held in *Cox v. Lumbermens Mutual Casualty Co.* (1982), 108 Ill. App. 3d 643, 439 N.E.2d 126, followed by *Long v. Bucyrus-Erie Co.* (1983), 112 Ill. App. 3d 578, 445 N.E.2d 934, and *Shaheed v. Chicago Transit Authority* (1985), 137 Ill. App. 3d 352, 484 N.E.2d 542, that while the *Westinghouse* rule still applies to other indemnification contracts, it has been rendered a nullity with respect to indemnification agreements in the construction industry by reason of the enactment of section 1 of the Act.

Poulos contends that since the insurance provision in paragraph 11.5.1 of the contract is not an agreement to indemnify, barred by the Act, the *Westinghouse* rule of strict construction remains applicable. Poulos argues that the provision does not satisfy *Westinghouse* because it does not explicitly require Poulos to provide insurance covering the Village's own negligence. Poulos also asserts that our recent opinion in *Jokich v. Union Oil Co.* (1991), 214 Ill. App. 3d 906, 574 N.E.2d 214, is incorrect. In *Jokich*, we held that the *Westinghouse* rule did not apply to the *Jokich* agreement, which required the contractor to procure comprehensive general liability insurance naming

the owner as an additional insured. We decline to retreat from our opinion in *Jokich*.

Section 3 of the Act provides that "[t]his Act [barring indemnification for another's negligence] does not apply to construction bonds or insurance contracts or agreements." (Ill. Rev. Stat. 1989, ch. 29, par. 63.) In *Capua v. W.E. O'Neil Construction Co.* (1977), 67 Ill. 2d 255, 367 N.E.2d 669, the contractors challenged the constitutionality of section 3, alleging that it was an arbitrary exception to section 1 which voids all indemnity and hold-harmless agreements in the construction industry. The *Capua* court disagreed.

Quoting extensively from *Davis*, the *Capua* court reviewed at length the above-noted public policy reasons for passage of section 1 of the Act. The court then discussed the public policy considerations underlying the legislature's decision to exempt those indemnity agreements contained in construction bonds and insurance contracts from the general prohibition of indemnity agreements in section 1. The court found no public policy conflict between sections 1 and 3. Rather, it determined that section 3, like section 1, was intended to promote the welfare of construction workers and the general public. The *Capua* court reasoned:

> "[Section 3] protects the interests of construction workers and members of the general public who may suffer injury through improper construction or maintenance by preserving supplemental sources of compensation for injured persons, namely insurance and indemnifying and hold-harmless agreements in construction bonds. * * *
>
> * * * [S]ections 1 and 3 are harmonious; they evidence a legislative intendment to protect the interests of the construction worker and the general public." (67 Ill. 2d at 260-61.)

Although the agreement in *Capua* was in a construction bond, the court's reasoning is also directly applicable to insurance agreements which, as the court noted, are expressly encompassed within section 3.

■ In the instant case, we recognize that the agreement at issue is not a section 3 contract *of* insurance but, rather, an agreement to obtain a contract of insurance. In contrast to a contract of insurance, under an agreement to obtain insurance, the promisor does not become the insurer or otherwise assume personal liability for injuries or damages for which the promisee may be liable. The promisor merely agrees to obtain the coverage and pay the premium for it. Once the insurance is obtained, the promisor bears no responsibility in the event of injury or damages, and is not liable even if the insurance car-

rier breaches the insurance contract through no fault of the promisor. *Jokich v. Union Oil Co.*, 214 Ill. App. 3d at 910; *Zettel v. Paschen Contractors, Inc.* (1981), 100 Ill. App. 3d 614, 427 N.E.2d 189.

Since contracts *of* insurance are expressly allowed by section 3 of the Act and further the public interest in there being adequate sources of compensation for construction-related injuries, application of the rule of strict construction, the purpose of which was to restrict disfavored personal indemnity contracts, would inhibit rather than promote the public policy favoring insurance. Moreover, the purpose of being a named insured on a liability policy is to obtain protection against injuries and damages for which, by reason of its acts or omissions, the insured may become liable. (See generally J. Appleman, Insurance Law & Practice §§4252 through 4261 (Buckley ed. 1979).) Thus, we do not agree that an agreement to procure liability insurance which acts to protect the promisee must explicitly state that the insurance will cover the promisee's "own negligence."

The clause at issue is an agreement to purchase certain contracts of liability insurance and to name the Village as an additional co-insured. The extent of Poulos' responsibility under the agreement was to obtain and pay the premiums on those policies. Poulos did not assume an unknown or extraordinary risk of liability for the Village's negligence of the type indemnitors assumed in now-prohibited indemnity agreements in the construction industry. Poulos assumed only the limited and known responsibility of paying the premiums on the policies it agreed to obtain; and, had it fulfilled its promise to do so, it would not have been subject to further liability or responsibility for injuries, damages or the cost of defending claims alleged to have arisen out of the Village's own negligence. The burden of such liability would have been borne by the insurer which accepted the premiums.

The Village's counterclaim does not seek to compel Poulos to be either its insurer or indemnitor. The Village is suing for damages and costs of defense arising out of Poulos' breach of its contractual duty to purchase insurance which named the Village as an additional co-insured. See *Zettel v. Paschen Contractors, Inc.*, 100 Ill. App. 3d 614, 427 N.E.2d 189.

Poulos argues that our holding in *Jokich* contravenes the precedent set in *Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 392 N.E.2d 628. We disagree. The contractual provisions at issue in *Svenson* are significantly different than those in the case at bar, in that in *Svenson*, the subcontractor agreed to procure liability insurance "to *** hold [the contractor] harmless from any claim for injury

or damage." (74 Ill. App. 3d at 79.) Thus it appears that only the subcontractor, and not necessarily the contractor, was required to be named as the party insured under the policy, and that, therefore, it was not intended that the insurer assume direct liability for claims against the contractor. In contrast, the agreement before us expressly required that Poulos have the Village named as a co-insured.

Further, there is nothing in *Svenson* indicating that the court considered the public policy interests underlying the development of the law relating to indemnity and insurance in the construction industry. Indeed, the court did not even mention the Indemnity Act. As we noted in *Jokich*, the *Svenson* court merely stated in summary fashion and without citation to any authority that " '[a]lthough the instant case involves an agreement to procure insurance rather than to provide direct indemnity, we believe the general rule as adopted in *Westinghouse* remains applicable.' " (*Jokich*, 214 Ill. App. 3d at 912, quoting *Svenson*, 74 Ill. App. 3d at 88-89.) Thus, to the extent *Svenson* stands for the proposition that all construction agreements to purchase insurance are governed by the *Westinghouse* rule of strict construction, we respectfully decline to follow it.

As we stated in *Jokich*, we believe that our holding is supported by post-*Svenson* case law. In *Zettel v. Paschen Contractors, Inc.* (100 Ill. App. 3d 614, 427 N.E.2d 189), the court reversed the dismissal of the contractor's suit for damages arising out of the subcontractor's breach of its agreement to obtain insurance covering "all claims arising out of [the operation of] any structural work law." (100 Ill. App. 3d at 615.) The agreement did not specifically state that the insurance was to cover the contractor's "own negligence," nor did it require that the contractor be named as an additional insured. Quoting the supreme court in *Capua v. W.E. O'Neil Construction Co.* (67 Ill. 2d 255, 367 N.E.2d 669), the *Zettel* court found that a promise to obtain insurance was fundamentally different from a promise to indemnify and, therefore, was not unenforceable as being contrary to public policy.

In *Bosio v. Branigar Organization, Inc.* (1987), 154 Ill. App. 3d 611, 612, 506 N.E.2d 996, the agreement required the contractor to " 'furnish public liability insurance *** indemnifying and saving harmless the [owner] from any and all personal injury claims arising *** by reason of the performance of this contract.' " Citing, *inter alia, Capua* and *Zettel*, the court reviewed the public policy interests favoring construction bonds and insurance contracts in the construction industry, and ruled that notwithstanding the language used, the provision

was not an invalid indemnity contract but, rather, a valid and enforceable agreement to obtain insurance covering claims against the owner.

Similarly, in *St. John v. City of Naperville* (1987), 155 Ill. App. 3d 919, 508 N.E.2d 1128, the court applied the standard rules of contract construction and found that by the plain language used, the agreement expressed the parties' intent that the contractor was to secure insurance covering claims against the city. The court held that the contractor was liable to the city for the costs of defending the underlying action by the injured worker and for a sum equal to any judgment entered against the city in that suit by reason of its breach of the agreement.

In none of these cases, *i.e., Zettel, Bosio* or *St. John*, was the *Westinghouse* rule applied or discussed in determining that the agreements to obtain insurance were enforceable. Neither was the *Westinghouse* rule mentioned by the supreme court in *Capua*, in the court's discussion of the public policy favoring insurance and construction bonds.

It is clear from the language used in the insurance clause at issue that the intent of the parties was that Poulos would purchase numerous liability insurance policies under each of which the Village was to be named as a co-insured and thereby protected against loss or liability for personal injuries. Absent some other evidence which would defeat the Village's counterclaim, Poulos' acknowledged failure to do so constituted a breach of a valid and enforceable agreement. Consequently, the order of the trial court dismissing count I of the Village's counterclaim for breach of contract must be reversed.

The agreement in this case also contained an indemnity provision which states:

> "To the fullest extent permitted by law, [Poulos] shall indemnify and hold harmless the [Village] \*\*\* from and against claims, any and all damages, losses and expenses, including but not limited to attorneys' fees arising out of or resulting from performance of the Work by of [*sic*] [Poulos], a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, *regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.*" (Emphasis added.)

Poulous argues that the phrase we have italicized purports to promise indemnification of the Village against its own negligence and, therefore, is contrary to public policy and void and unenforceable under section 1 of the Act.

The Village asserts that the statute is meant only to prohibit indemnity which relieves one of liability arising *exclusively* from that party's own negligence. The Village points out that Duffy's complaint contains identical allegations of Structural Work Act violations against it and Poulos. Thus, the Village argues, since Duffy's claim is not based exclusively on alleged wrongful conduct by the Village, but also on alleged wrongful conduct by Poulos, it, the Village, is at least entitled to a defense of the claim by Poulos under the above-quoted provision. We disagree.

■ The Village cites no authority, nor have we found any, which interprets the Act to apply only to indemnification for liability which arises exclusively from one's own negligence. Section 1 of the Act (Ill. Rev. Stat. 1989, ch. 29, par. 61) prohibits "every covenant, promise or agreement" to indemnify another from that person's own negligence without qualification or limitation.

Here, Duffy's complaint alleges wilful violations by the Village of the Structural Work Act. In order to be found culpable of a "wilful violation," it is only necessary that a defendant knew or, in the exercise of reasonable care, should have known of the existence of the dangerous condition. (*Ryan v. E.A.I. Construction Corp.* (1987), 158 Ill. App. 3d 449, 511 N.E.2d 1244.) Even a defendant who is only passively or technically negligent may be found liable under the Structural Work Act. (*Motor Vehicle Casualty Co. v. G S F Energy, Inc.* (1989), 193 Ill. App. 3d 1, 549 N.E.2d 884.) Whether or not Duffy sustains his claim against the Village is irrelevant, because the claim itself is based on alleged negligence by the Village. Because the clause at issue purports to promise indemnification for all damages and expenses, including defense costs, for claims arising from the Village's own negligence, it is void and wholly unenforceable as being in contravention of the Act, and the Village cannot seek any form of indemnification from Poulos under this clause.

For the reasons stated, the order of the trial court dismissing that portion of the Village's counterclaim against Poulos for breach of contract is reversed; the dismissal of that portion of the Village's counterclaim seeking indemnification from Poulos is affirmed; and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed in part, affirmed in part and remanded.

JOHNSON and LINN, JJ., concur.