**CHICAGO HOUSING AUTHORITY,**
Cross–Plaintiff–Appellant,

v.

**FEDERAL SECURITY, INC.,** Cross–
Defendant–Appellee.

No. 97–2378.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1998.

Decided Nov. 27, 1998.

Phillip A. Turner (argued), Turner & Associates, Chicago, IL, for Chicago Housing Authority.

Edward R. Ruberry, Michael E. Silverman (argued), Bollinger, Ruberry & Garvey, Chicago, IL, for Federal Security, Incorporated.

Before COFFEY, MANION, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This case is a classic dispute about who must ultimately pay for the catastrophic consequences of someone's negligent, or possibly even intentional, acts. While working under a contract for the Chicago Housing Authority (CHA), two security guards employed by Federal Security, Inc. (FSI), shot and killed Levangelist Hightower, the son of Beverly Hightower. On her own behalf and on behalf of her son's estate, Beverly sued the guards, the CHA, and FSI. Before the trial began, she settled with all of the defendants. We are left with a dispute between the CHA and FSI over the question whether FSI breached its contract with CHA by failing to secure insurance coverage protecting CHA and whether FSI had an enforceable duty to indemnify CHA under the same contract. On cross-motions for summary judgment, the district court ruled in FSI's favor, holding that Illinois state law precluded FSI from indemnifying or insuring CHA against CHA's own negligent or intentional acts. We conclude that this ruling does not adequately take into account the relative culpability of the CHA and FSI for these acts. Under the circumstances presented here, our best prediction is that Illinois would enforce both FSI's promise to indemnify the CHA and its promise to procure insurance in the CHA's favor, and we must therefore do so as well.

## I

After the death of her son, Hightower brought an action against the CHA, FSI, and the two individual guards who were responsible for the actual shooting. Her fourth amended complaint contained eleven counts. The only ones relevant here are the ones against the CHA, counts VII, VIII, and IX. Count VII requested damages under 42 U.S.C. § 1983 for the CHA's violation of Levangelist's civil rights; Count VIII alleged that the CHA had negligently hired, trained, and retained FSI as a private security contractor; and Count IX returned to the § 1983 theory but asked for injunctive relief. Before trial, the two guards and FSI settled with Hightower, and on the day of trial, the CHA settled. In the same minute order in which it acknowledged the settlement and expressly retained jurisdiction over it, the court granted the CHA's motion for leave to file a cross-claim against FSI. In that cross-claim, the CHA alleged that FSI had breached its contract with the CHA in two respects: by failing to indemnify the CHA for Hightower's claim, and by failing to obtain insurance for CHA.

Article 8 of the contract between the CHA and FSI required FSI to purchase a $1,000,000 per occurrence insurance policy

> insuring [FSI] and CHA as an *additional named insured* against any and all losses, claims, damages or injury arising out of any claim involving the providing of or the

alleged failure to provide contracted security services or adequate services.

(Emphasis in original.) In addition to this obligation to procure insurance, Article 8 of the contract also contained broad language obligating FSI to indemnify CHA:

> [FSI] agrees to completely indemnify and hold harmless CHA . . . against any liability or expense . . . arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of [FSI] or its agents in the performance of this contract.

Article 8 also required FSI or its insurer to pay the CHA's defense costs for any case falling within its scope.

Apparently without the CHA's knowledge, FSI neglected to procure the promised insurance policy. It also refused to indemnify the CHA for the settlement and related costs. The CHA asserted in its cross-claim that FSI had therefore breached the contract in both respects. After the parties consented to have their dispute resolved by a magistrate judge, see 28 U.S.C. § 636(c), the district court resolved cross-motions for summary judgment in FSI's favor on both points. The court reasoned that Hightower's complaint alleged negligence and deliberate indifference by the CHA itself, not by FSI, and, reading governing Illinois law to forbid a party to contract for insurance or indemnification covering its own negligent or intentional acts, it concluded that FSI was entitled to summary judgment. The CHA appealed.

**II**

We agree that the three counts naming the CHA as a defendant all involve allegations of the CHA's own negligence (Count VIII) or intentional deprivation of rights (Counts VII and IX). These are not claims that the CHA is liable strictly on a respondeat superior theory for the negligence of its agent, FSI. We consider first whether FSI was obliged to indemnify the CHA, and then whether it breached the contract by failing to procure insurance covering the CHA.

*A. Indemnification*

For many years, the Illinois Supreme Court has followed the rule that "an indemnity contract will not be construed as indemnifying one against his own negligence, unless such a construction is required by clear and explicit language of the contract, or such intention is expressed in unequivocal terms." *Westinghouse Elec. Elevator Co. v. La Salle Monroe Bldg. Corp.*, 395 Ill. 429, 70 N.E.2d 604, 607 (Ill.1946) (citations omitted); see also *Davis v. Marathon Oil Co.*, 64 Ill.2d 380, 1 Ill.Dec. 93, 100, 356 N.E.2d 93, 100 (1976); *Tatar v. Maxon Const. Co.*, 54 Ill.2d 64, 294 N.E.2d 272, 273–74 (1973). "It is not necessary, however, that specific reference to indemnification against liability arising out of the indemnitee's negligence be provided for in the agreement." *Duffield v. Marra, Inc.*, 166 Ill.App.3d 754, 117 Ill.Dec. 587, 594, 520 N.E.2d 938, 945 (1988). Rather, "[t]he agreement must be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions." *Id.* The district court thought that because the indemnification language of Article 8 quoted above did not in terms express a promise by FSI to indemnify the CHA against its own negligence, that was the end of the matter—under *Westinghouse*, there was no such duty.

We think the court moved too quickly to that conclusion. First, of course, it had to decide whether the contract's clear and explicit language required indemnification, or if on the other hand it was ambiguous. See, *e.g.*, *Westinghouse*, 70 N.E.2d at 606–07; *Freislinger v. Emro Propane Co.*, 99 F.3d 1412, 1420 (7th Cir.1996). If the contract was not ambiguous, then it was the court's responsibility to enforce it. *Freislinger*, 99 F.3d at 1420, citing *Westinghouse* and *Tatar*. Applying Illinois law, this court found in *Freislinger* that a contract requiring a party to indemnify its contracting partner for "any and all claims . . . connected with or arising out of the use of [the] storage tank or with the use of propane gas" had the necessary clarity to make the indemnification agreement enforceable as to the contracting partner's negligence. *Id.*; see also *Economy Mechanical Industries, Inc. v. T.J. Higgins*

*Co.*, 294 Ill.App.3d 150, 228 Ill.Dec. 327, 330–31, 689 N.E.2d 199, 202–03 (1997) ("In an indemnity agreement, a general reference to 'any and all' claims, losses, injuries, and the like, will generally be construed as indicating an intention by the parties that the indemnitee be indemnified for damages resulting from the indemnitee's own negligence.").

■ We consider indemnification for negligence first, and then for intentional acts. The CHA claimed that the indemnity clause was enforceable with respect to Count VIII, the only one based on negligence. The language of Article 8 of the present contract is quite similar to the terms we considered in *Freislinger*. FSI promises "to completely indemnify and hold harmless CHA ... against any liability or expense ... *arising out of* any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of [FSI] or its agents in the performance of this contract." (Emphasis added.) The clause refers only to the possibility of FSI's negligence or intentional acts and does not mention the CHA. At a minimum, therefore, this language required FSI to indemnify the CHA for any claim based on a respondeat superior theory. In our view, however, the "arising out of" language gives the clause a broader scope, which reaches the particular breed of negligence ascribed to the CHA here. The claim based on the CHA's negligent failure to use ordinary care in the hiring, training, and retention of FSI required proof that reasonable inquiry would have revealed FSI's own deficiencies. In that sense, Count VIII is grounded on an assertion of FSI's agents' negligent or intentional act. As we read the Illinois cases, the language of this agreement is broad enough and explicit enough to allow the CHA's claim of indemnification for its own negligence to go forward. See, *e.g.*, *Duffield*, 117 Ill.Dec. 587, 520 N.E.2d at 944–45; *Ahlvers v. Terminal R.R. Ass'n*, 31 Ill. App.3d 166, 334 N.E.2d 329, 332–33 (1975).

■ Although the analysis of the indemnification claims for Counts VII and IX differs, the ultimate result is the same. Both those counts raise claims under § 1983. (Indeed, since they seem to differ only on remedy, they did not need to be brought as separate claims, see Fed.R.Civ.P. 54(c), but we disregard this pleading flaw since even if an objection had resulted in a stricken count, the available remedies would have stayed the same under the surviving count. *Id.*) It is well established that a § 1983 claim requires proof of intentional acts to deprive the victim of her civil rights. See, *e.g.*, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Nabozny v. Podlesny*, 92 F.3d 446, 453–54 (7th Cir.1996). Hightower properly alleged such acts when she claimed that the CHA had displayed deliberate indifference to ongoing illegal activity by FSI's guards. *Nabozny*, 92 F.3d at 454; *cf. Farmer v. Brennan*, 511 U.S. 825, 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Illinois Supreme Court has held that "an agreement to indemnify against wilful misconduct would, as a general rule, be contrary to public policy and unenforceable though there were no statute to that effect." *Davis v. Commonwealth Edison Co.*, 61 Ill.2d 494, 336 N.E.2d 881, 885 (1975); see also *University of Illinois v. Continental Cas. Co.*, 234 Ill.App.3d 340, 175 Ill.Dec. 324, 336, 599 N.E.2d 1338, 1350 (1992).

In considering whether that general rule applies in the circumstances presented here, it is important to recall the context in which the rule developed. *Davis* arose under the Illinois Structural Work Act, Ill.Rev.Stat. 1971, ch. 48, ¶¶ 60–69, which provided that agreements in various kinds of construction contracts to indemnify a person from that person's own negligence were void as against public policy and wholly unenforceable. Noting that the statute was designed to protect construction workers and to reduce any incentive to avoid taking protective measures, the Illinois Supreme Court ruled that the Structural Work Act rendered unenforceable an indemnity agreement for contracts governed by it. Applying that principle, the Court refused to enforce an agreement under which a general contractor had promised to indemnify the architect for all claims or judgments for any injuries on a restaurant construction site, even injuries caused by the architect's own negligence. See also *University of Illinois*, 175 Ill.Dec. 324, 599 N.E.2d

at 1350 (commenting on factual context of *Davis*).

The situation we face is entirely different: to the extent Hightower's original complaint included charges against the CHA at all, its allegations related to CHA's dealings with FSI. Thus, as we noted above, it claimed that the CHA was deliberately indifferent to ongoing illegal activity by the FSI guards, and that the CHA was negligent in choosing FSI as the security provider. We see nothing in the general Illinois rule against contracts to indemnify someone for the consequences of its intentional or negligent acts that would preclude enforcement of a contract requiring the primary wrongdoer to bear the financial burden of its actions. FSI is hardly an innocent player here; to require it to indemnify the CHA for the illegal activity of FSI's own guards or for FSI's allegedly sloppy security would not compromise either of the principal concerns identified by the Illinois Supreme Court in *Davis*. It would not leave CHA residents less protected than before, nor would it reduce the incentives of either the CHA or FSI to take preventative measures. We therefore conclude, contrary to the district court, that Illinois law does not render Article 8 unenforceable, and that the CHA is entitled to require FSI to indemnify it for these claims.

### B. *Insurance*

 Despite a fair amount of Illinois law on the subject, the district court relied on a recent Nebraska case, *Anderson v. Nashua Corp.*, 251 Neb. 833, 560 N.W.2d 446 (1997), for its conclusion that FSI was not obliged to insure CHA against the consequences of its own negligent or intentional acts. In *Anderson*, the Nebraska court described and followed a "clear statement" rule for agreements to purchase insurance that looks very much like the *Westinghouse* indemnification rule in Illinois. We think that Illinois law suffices to answer this question, and so we make no comment on *Anderson*.

Some Illinois appellate courts have extended the *Westinghouse* rule from indemnification agreements to contracts to buy insurance for negligent or intentional acts, while others have upheld such contracts without regard to any "clear statement" rule. The first decision extending *Westinghouse* was *Svenson v. Miller Builders, Inc.*, 74 Ill. App.3d 75, 29 Ill.Dec. 931, 392 N.E.2d 628 (1979), which stated that "[a]lthough the instant case involves an agreement to procure insurance rather than to provide direct indemnity, we believe the general rule as adopted in *Westinghouse* remains applicable." *Id.* at 941, 392 N.E.2d at 638; see also *Coverdill v. Lurgi Corp.*, 146 Ill.App.3d 112, 99 Ill.Dec. 915, 917, 496 N.E.2d 1007, 1009 (1986). The contrary view, which has been followed in a series of recent Illinois appellate cases, rests on two observations. First, these courts

> recognize that the agreement at issue is not a . . . contract of insurance but, rather, an agreement to obtain a contract of insurance. In contrast to a contract of insurance, under an agreement to obtain insurance, the promisor does not become the insurer or otherwise assume personal liability for injuries or damages for which the promisee may be liable. The promisor merely agrees to obtain the coverage and pay the premium for it. Once the insurance is obtained, the promisor bears no responsibility in the event of injury or damages, and is not liable even if the insurance carrier breaches the insurance contract through no fault of the promisor.

*Duffy v. Poulos Bros. Const. Co.*, 225 Ill. App.3d 38, 167 Ill.Dec. 423, 427, 587 N.E.2d 1038, 1042 (1991), distinguishing *Westinghouse* and citing *Jokich v. Union Oil Co.*, 214 Ill.App.3d 906, 158 Ill.Dec. 420, 424, 574 N.E.2d 214, 218 (1991); see also *Intergovernmental Risk Management v. O'Donnell, Wicklund, Pigozzi & Peterson Architects, Inc.*, 295 Ill.App.3d 784, 229 Ill.Dec. 750, 755–56, 692 N.E.2d 739, 744–45 (1998); *Zettel v. Paschen Contractors, Inc.*, 100 Ill.App.3d 614, 56 Ill.Dec. 109, 427 N.E.2d 189 (1981). Second, the courts have held that as a result, contracts to buy insurance do not implicate the critical public policy consideration behind the *Westinghouse* rule, which was "to insure that one agreeing to the extraordinary liability of indemnifying another against his own negligence was fully aware of the extent of his own liability." *Duffy*, 167 Ill.Dec. at 427,

587 N.E.2d at 1042; see also *Westinghouse*, 70 N.E.2d at 607. From these two observations, they conclude that the *Westinghouse* clear statement rule is inapplicable to such cases, and "absent some other evidence" narrowing the scope of a promise to purchase a general liability insurance policy, a party's failure to purchase the contractually mandated policy "constitute[s] a breach of a valid and enforceable agreement," even if the loss that triggers the dispute is allegedly a product of the uninsured party's own negligence. *Duffy*, 167 Ill.Dec. at 427–28, 587 N.E.2d at 1042–43.

Even if *Duffy* and *Jokich* do not represent the eclipse of the older *Svenson*-based cases importing *Westinghouse* into contracts to purchase insurance, we would still follow *Duffy* and *Jokich* in this case. As the *Duffy* court pointed out, the key difference between the *Svenson* case and cases like *Duffy*, *Jokich*, and the one before us, is that in *Svenson*,

> only the [defendant who had agreed to purchase insurance], and not necessarily the [plaintiff complaining of the failure of the defendant to purchase insurance], was required to be named as the party insured under the policy; and that therefore it was not intended that the insurer assume direct liability for claims against the [plaintiff]. In contrast, the agreement before us [in *Duffy* and in this case] expressly required that [the defendant, *i.e.*, FSI] have the [plaintiff, *i.e.*, the CHA] named as a co-insured.

*Duffy*, 167 Ill.Dec. at 428, 587 N.E.2d at 1043; see also Article 8 ("insuring itself [*i.e.*, FSI] and CHA as an additional named insured"). As a result, the two important differences identified by the *Duffy* court between *Westinghouse* and contract-to-purchase-insurance cases were not factors in *Svenson*. But they are here, and so we follow *Duffy* and *Jokich*, without passing judgment on the *Svenson* line of cases.

As further support for its decision, the district court pointed to *Juretic v. USX Corp.*, 232 Ill.App.3d 131, 173 Ill.Dec. 186, 596 N.E.2d 810 (1992). As in our case, the contract in *Juretic* contained separate provisions requiring indemnification and insurance. The parties had conceded that the indemnification clause was void, and so the court considered only the enforceability of the insurance clause. An insurance clause that was "inextricably tied" to the void indemnity clause, it held, would not be enforceable. However, the *Juretic* court went on to find that only one of three parts of the insurance clause before it fell as a result of that rule; the other two parts covered matters other than obligations under the void indemnity provision and were thus enforceable.

We find two distinct problems in the district court's application of the *Juretic* rule to the facts of this case. First, no one ever found that this indemnification clause was void. (The clause in *Juretic* suffered that fate because of the special Illinois rule for construction contracts.) It was clear from the start that the clause was perfectly valid insofar as it applied to FSI's obligation to indemnify CHA for derivative liability claims, and we have now found that under these circumstances it was enforceable as well for direct claims. Second, the court never considered the closeness of the connection between the two clauses—an inquiry that, as we noted above, actually saved two-thirds of the insurance clause in *Juretic* itself. Applying the approach taken to the "inextricable link" question in the recent Illinois case of *Tanns v. Ben A. Borenstein & Co.*, 293 Ill. App.3d 582, 227 Ill.Dec. 974, 977–78, 688 N.E.2d 667, 670–71 (1997), we think that here the two clauses were independent enough to permit full enforcement of the insurance agreement. The contract in this case contains express language requiring that CHA be a named insured on the policy FSI purchases, and it covers matters other than those in the indemnity agreement—both factors that were important in *Tanns*. This is not like *Shaheed v. Chicago Transit Auth.*, 137 Ill.App.3d 352, 92 Ill.Dec. 27, 484 N.E.2d 542 (1985), which found an inextricable link where the insurance provision just referred to the indemnity provision for a definition of the scope of the obligation. In *Shaheed*, the indemnity provision was void under the construction statutes, and the court thought nothing was left for the insurance provision to cover.

Last, the district court was mistaken in its conclusion that Illinois prohibits agreements to obtain insurance that covers a party's intentional acts. In 1994, the Supreme Court of Illinois "recognize[d] that it is generally held that a contract of insurance to indemnify a person for damages resulting from his own intentional misconduct is void as against public policy and courts will not enforce such a contract," but that in the absence of "any Illinois case, statute or legislative directive specifically holding that providing insurance coverage against liability for injuries resulting from intentional acts is void as against the public policy of Illinois," the court decided not to adopt a rule "against insuring for damages from intentional misconduct" in the case before it. See *Dixon Distributing Co. v. Hanover Ins. Co.*, 161 Ill.2d 433, 204 Ill. Dec. 171, 177, 641 N.E.2d 395, 401 (1994); see also *University of Illinois*, 175 Ill.Dec. 324, 599 N.E.2d at 1350–51 (discussing cases in which intentional civil rights violations and similar intentional acts were found to be insurable).

The contract therefore validly gave CHA the right to claim indemnification from FSI for Hightower's claim and to enforce FSI's obligation to procure insurance for it. We therefore REVERSE the district court's summary judgment for FSI and REMAND for further proceedings in accordance with this opinion.